24 C.C.P.A.(Patents)

### NICHOLS v. ATKINSON.

Patent Appeal No. 3716.

Court of Customs and Patent Appeals.
March 22, 1937.

Horace C. Chandlee, of Washington, D. C. (Ralph Burch, of Washington, D. C., of counsel), for appellant.

Roberts, Cushman & Woodberry, of Boston, Mass. (Richard F. Walker, of Boston, Mass., and Cushman, Darby & Cushman and Arlon V. Cushman, all of Washington, D. C., of counsel), for appellee.

Before GRAHAM, Presiding Judge, and BLAND, HATFIELD, GARRETT, and LENROOT, Associate Judges.

HATFIELD, Associate Judge.

This is an appeal in an interference proceeding from the decision of the Board of Appeals of the United States Patent Office affirming the decision of the Examiner of Interferences awarding priority of invention to appellee.

The interference is between appellant's application, serial No. 624,853, filed July 26, 1932, and appellee's patent No. 1,792,-058, issued February 10, 1931, on an application filed January 13, 1930. Twelve counts, Nos. 1 to 12, inclusive, are involved in this appeal.

The invention in issue relates to granular material composed, generally, of heat hardened non-vitrified granules of shale or clay of "angular shapes corresponding substantially to the fracture of the original shale," and a method for making the same.

Counts 1, 2, 6, 7, 9, and 10 are sufficiently illustrative of the counts in issue. They read:

"Count 1. Method of making colored granules comprising the steps of reducing compacted raw clay or shale to grains of the ultimately required size or sizes, separating the same from finer sizes, and dust, and heating to a hardening temperature, without fusion.

"Count 2. Method of making colored granules comprising the steps of reducing compacted raw clay or shale to grains of the ultimately required size or sizes, separating the same from finer sizes and dust, and heating to a hardening temperature, while agitating the granules."

"Count 6. Method of making colored granules, comprising the steps of reducing compacted raw clay or shale to grains of the ultimately desired size or sizes, containing mineral coloring agents, separating the same from finer sizes and dust, feeding the granules into contact with hot gases, and regulating the temperature and composition of said gases to determine the color of said granules.

"Count 7. Method of making ceramic materials, comprising the steps of crushing raw clay or shale to granular condition, separating granules of the desired size or sizes therefrom, mixing the smaller sizes of granules and dust with water to produce a plastic ceramic composition and firing the same."

"Count 9. Granular material, the individual granules being characterized by having a heat hardened, non-vitrified body of argillaceous shale and angular shapes corresponding substantially to the fracture of the original shale.

"Count 10. Granular material, the individual granules being characterized by having a heat hardened, non-vitrified body of compact clay and angular shapes corresponding substantially to the fracture of the original clay."

It is clear from appellant's application, appellee's patent, and the evidence of record that the granular material here involved is used principally for surfacing asphalt roofing, and, according to appellee's patent, is also used for surfacing cement roofing, and must be "suitable for use in architectural finishing and for decorative purposes."

690

It will be observed that count 1 provides for the making of granules by "reducing compacted raw clay or shale to grains of the ultimately required size or sizes, separating the same from finer sizes, and dust, and heating to a hardening temperature, without fusion."

Count 2 differs from count 1 in that it provides for agitation of the granules during the heating process.

Appellee's patent contains the statement that, in the event "colors other than the natural colors of the raw materials or colors imparted by the roasting operation are desired," suitable mineral coloring agents may be applied to the granular material before it is heated, as stated in substance in count 6, and in several of the other counts, including count 12.

Count 6 also provides for the regulation of the temperature and composition of the gases with which the granules come in contact "to determine the color of said granules."

Count 3 specifies that the granules shall be heated to a hardening temperature while in "intimate contact with a predetermined atmosphere."

Count 4 specifies that in hardening the granules they shall be "in uniform contact with a gas reactive to control the color of said granules."

Count 5 differs from count 4, in that it specifies that the composition of gas shall be maintained "substantially constant."

Count 8 differs from count 1, in that it states that the granules are used for "architectural finishing purposes."

Counts 9, 10, and 11 relate to the granules produced by the involved process. Each specifies that the granules shall be heat hardened and non-vitrified. Count 9 refers to the material as "argillaceous shale." The material specified in count 10 is "compact clay," and that specified in count 11 is "argillaceous material." Each of those counts further specifies that the shape of the granules shall correspond "substantially to the fracture of the original" material.

The prior art method of making clay or shale granules for surfacing asphalt roofing consisted in reducing bricks made from those materials into granules, and then screening the granules in order to obtain the desired size or sizes. Due to the hardness of the bricks, the crushing of them produced a considerable quantity of very fine granules and dust, which were of no further use.

It is stated, in substance, in appellee's patent that the prior art method of producing granular material was objectionable for the reason that the bricks from which the granules were produced might not be uniformly burned; that is to say, the bricks might be "over-burned on the outside or under-burned at the center," as a result of which their color and texture varied from the exterior to the interior, and, accordingly, the granules produced therefrom were of "corresponding variations of color, hardness and other properties such as density, weather resistance, adsorption," etc.

On September 10, 1930, appellant filed an application for a patent, serial No. 481,066, for roofing granules made by heating raw shale granules.

At the conclusion of the taking of depositions on behalf of appellant, notice was given by his counsel that his (appellant's) original application, serial No. 481,066, would be used as evidence at the final hearing.

In his decision, the Examiner of Interferences held that appellant was not entitled to the benefit of the filing date of his application filed September 10, 1930, on the ground that it did not disclose the invention defined by the involved counts.

In his appeal to the Board of Appeals, appellant specifically assigned as one of his reasons of appeal that the Examiner of Interferences erred in holding that appellant should derive no benefit in this interference from his application filed September 10, 1930. Although the Board of Appeals neither discussed nor specifically referred to this issue in its decision, it did state that it was "in full accord with the position taken by the Examiner of Interferences," and, accordingly, affirmed the Examiner's decision.

Although counsel for appellant state in their brief that appellant's application involved in this interference is a continuation in part of his application filed September 10, 1930, that issue was not discussed in their brief, nor were any reasons given why it should be so consider-

ed. Counsel for appellant content themselves with the statement that "it is submitted that the former application No. 481,066 *is entitled to consideration for all that might be disclosed therein.*" (Italics ours.) Furthermore, appellant failed to raise this issue in his reasons of appeal. Accordingly, it is not before us for determination. See Jantzen Knitting Mills v. West Coast Knitting Mills, 47 F.(2d) 954, 18 C.C.P.A. (Patents) 1142; George N. Mas v. Chapman J. Root, 54 F.(2d) 435, 19 C.C.P.A. (Patents) 819; George T. Southgate v. Albert E. Greene, 57 F. (2d) 374, 19 C.C.P.A. (Patents) 1129; Derby Oil Co. v. White Star Refining Co., 62 F.(2d) 984, 20 C.C.P.A. (Patents) 816.

Appellant's involved application was filed approximately seventeen months after the issuance of appellee's patent. Accordingly, the burden was upon appellant to establish priority of invention beyond a reasonable doubt.

In his preliminary statement, dated September 21, 1932, appellant stated that he conceived the invention defined by the appealed counts on or about January 1, 1922; that he first made a drawing of it about June, 1932; that he first made a written description of it on or about October 13, 1926; that he first disclosed it to others on or about July 1, 1922; that he first produced granules in accordance with the involved method on or about August 15, 1925; that they were successfully tested by him on or about August 20, 1925, in York, Pa.; and that since that time about two tons of the granules have been made and used for experimental purposes.

In his preliminary statement, appellee stated that he conceived the involved invention on or about September 30, 1929; that the first written description was made of it on October 8, 1929; that the first drawing was made of it on or before December 27, 1929; that it was disclosed to others on or about October 3, 1929; and that it was reduced to practice on or about October 14, 1929.

Although appellee submitted evidence pertaining to other matters in the case, he did not submit evidence for the purpose of establishing conception and reduction to practice prior to his filing date —January 13, 1930. Accordingly, he is restricted to his filing date for conception and reduction to practice.

It appears from the record that appellant was the chief engineer of the Funkhouser Company, Hagerstown, Md., which company has been engaged for many years in producing roofing granules from crushed brick; that R. J. Funkhouser & Co., Hagerstown, Md., is the largest stockholder of the Funkhouser Company, and markets all of the latter's products; that the experimental work in the development of the granules, referred to in appellant's application, was "performed under the name of The Funkhouser Company and R. J. Funkhouser & Co. * * * in behalf of Mr. Nichols [the appellant] and these Companies."

It is true that the quoted statements were included in a question propounded by counsel for appellant to Mr. E. N. Funkhouser, an active officer of the Funkhouser Company and R. J. Funkhouser & Co. However, the witness answered the question by saying: "That is correct."

It appears from the testimony of appellant that, although no formal assignment had been made, his employer—the Funkhouser Company—owned a joint interest with him in his involved application.

It further appears from the record that samples of granules made by appellant, or by others for him, were not only furnished Mr. R. J. Funkhouser, of R. J. Funkhouser & Co. and the Funkhouser Company, but the matter of development of such granules was discussed by appellant with R. J. Funkhouser and the witness E. N. Funkhouser.

Although appellant testified that he made several experiments during the years 1922, 1923, 1924, and 1925, and, on or about August 15, 1925, produced a satisfactory product by burning raw shale granules, his testimony, in that regard, is not supported by any corroborative evidence.

It appears from the testimony of the witness L. R. Voris, an industrial chemist of Hagerstown, Md., who stated that he had done work for the Funkhouser Company for many years both before and subsequent to the year 1930, and who testified for appellant, that, as early as 1926, he made experiments for appellant; that crushed shale granules were hardened by being subjected to heat in a rotary kiln; and that, "according to temperatures and

the amount of air which was regulated from the blower," three shades of red—light, medium, and dark—were produced. The witness further testified that he made intermittent experiments along the same line during the years 1927, 1928, 1929, and 1930. (So far as we are able to ascertain from his testimony, the largest quantity of raw granules burned by him at any one time was fifty pounds—March, 1929.) The witness further stated that the object in making additional experiments after 1929 was to "confirm our results which we had previously gotten." He also stated that the granules were agitated during the heating process. Although the witness stated that the work done by him in March, 1929, was a success, he did not state that the granules produced by him had any utility, nor did he state that they were subjected to tests of any kind, or that he had any information as to what constituted successful and satisfactory granules to be used in surfacing asphalt roofing.

The witness Orla A. Larsen, chemical engineer of F. L. Smidth & Co., New York City, testifying for appellant, said that, in the presence of appellant and a laboratory assistant, he burned raw shale granules for appellant on December 21, 1927, in his company's laboratory, located in Elizabeth, N. J.; that the granules were burned at various temperatures ranging from 1200° F. "up to about the temperatures at which" they "would fuse together," and that the amount of air used in the experiment "was changed in such a manner that some of the tests" were "made by using a reducing flame" and some were made "by using an oxidizing flame." The witness identified appellant's Exhibit No. 2, which consists of several pages of correspondence between F. L. Smidth & Co. and the Funkhouser Company. The first two pages of the exhibit, dated December 14, 1927, have to do with the delivery of raw shale granules to F. L. Smidth & Co. for experimental purposes, and the last five pages, dated February 8, 9, and March 23, 1928, respectively, relate to the proposed installation of a rotory kiln capable of producing ten tons of granules per hour, together with an estimate of the cost of such installation. (It appears from the testimony of the witness that the installation, to be made by F. L. Smidth & Co. for the Funkhouser Company, was not made.) On cross-examination, the witness testified that he had personally tested the granules in order to *ascertain the comparative hardness of the burned and the raw granules.* When asked the nature of his tests, he said he "Tested them just with a blow of a hammer." Whether the witness had any previous experience with "roofing granules" or any knowledge of the qualities necessary to make them suitable for their intended use does not appear of record.

The witness Charles A. Nicely, superintendent of the Watsontown Brick Company, Watsontown, Pa., testifying for appellant, stated that his company was engaged in the manufacture of brick and clay products; that he had known appellant since some time in 1927; that during that year the Funkhouser Company installed a plant for making granules out of brick at Watsontown, Pa.; that his company supplied appellant with raw shale granules at intervals from 1927 to the time of the taking of his testimony—September, 1933; that, from time to time during those years, some of those granules were burned in the kilns of the Watsontown Brick Company; that, during the year 1932, the Funkhouser Company started the installation of a commercial plant for burning raw shale granules on the property of the Watsontown Brick Company, and began commercial operations late in that year.

The witness T. B. Neikirk, called by appellant, testified that he was plant manager of the granule plant of the Funkhouser Company at Watsontown; that his duties as plant manager were to produce and ship crushed brick granules and crushed screened raw shale granules; and that he had shipped some raw shale granules to the witness Voris. The witness identified Appellant's Exhibit No. 3, which is a letter, dated August 24, 1929, from appellant to the witness requesting the shipment of fifty pounds of Watsontown raw shale granules to the "Voris Laboratories, Hagerstown, Md.," and said that he complied with that request, and, although he did not recall the dates, also shipped raw shale granules to others over a period of about three or four years.

The following witnesses testified for appellee: C. Douglas Mercer, Hiram T. Folsom, Clarence L. Colbert, Ralph W. B.

Reade, and the appellee, Ralph L. Atkinson.

The witness C. Douglas Mercer, engaged at the time of the taking of his testimony in "Working out industrial bank loans," but who, from February, 1924, to December, 1932, was employed by the Flintkote Company, a manufacturer of roofing, in the capacity of special assistant to the president in charge of expense control, and from August, 1930, in addition to his other duties, was in charge of purchasing, testified that, prior to his being placed in charge of the purchasing of materials, his company entered into a contract with the Fiske Brick & Granule Company of Hamilton, Mass. (owner of appellee's patent and hereinafter referred to as the Fiske Company), for the purchase of roofing granules made from raw shale; that the Funkhouser Company of Hagerstown, Md., sold brick granules and various other materials to his company; that he was in frequent contact with Mr. R. J. Funkhouser; that during the course of his association with Mr. Funkhouser and between August, 1930, and before and after the delivery of granules to his company by the Fiske Company, Mr. Funkhouser "urged us to continue to buy crushed brick granules because he told us that he did not believe that the Fiske Company could supply us with a satisfactory roofing granule produced by their continuous process, because they did not have the financial resources to carry out the process and deliver granules, and because the Funkhouser Company had experimented extensively with the same process and had not been able to produce satisfactory roofing granules." The witness further stated that all granules used by the Flintkote Company were tested in commercial quantities in the laboratory and on test sheds; that screen tests were also made; that samples were kept in the laboratories "to identify color"; that deviation from the standard qualities was a sufficient cause for rejecting shipments of granules; and that, before granules were accepted by his company, they were checked at the factory in order to determine whether they possessed the qualities of tested and accepted granules. Testifying further with regard to the tests made by the Flintkote Company, he said: "First, a number of roofing squares were run at the end of the day, shingles or roofing was then taken to the research laboratories, whose regular procedure was to test them in a weatherometer, an accelerative testing device, and to put them on test racks at the different roofing factories, and in particular at New Orleans, where weather conditions were worst."

The witness Hiram T. Folsom, president of the Fiske Company, stated, among other things, that he first met appellant in his (the witness') office in Boston in January or February, 1930; that the purpose of appellant's visit was to discuss the possible purchase of brick by the Funkhouser Company from appellant's company for the purpose of making granules therefrom. The witness said that he told appellant, Mr. Nichols, that the Fiske Company was contemplating manufacturing granules from raw shale, and showed him some samples of shale granules that had been produced by that company. We quote from the testimony of the witness:

"Q. 70. State what, if any, comment he made on these samples. A. Mr. Nichols told me that the samples appeared interesting and he thought it would be a wonderful thing if we could make them under the process I described.

"Q. 71. *And that process you had described was what?* A. *The process described in the Atkinson patent.*

"Q. 72. Did Mr. Nichols at that time make any mention of any prior activities by him in making burned shale granules? A. No.

"Q. 73. State whether or not Mr. Nichols made any mention of any prior claim by him to rights in such process of making granules. A. He did not.

"Q. 74. Did you give Mr. Nichols at that meeting any of your burned shale granules to take away with him? A. Yes; I gave him a sample of red burned shale granule, which I think we called at that time 'No. 101,' and a sample of green shale granule made from fire clay.

"Q. 75. I show you Atkinson Exhibit A, already in evidence, and ask you whether that refers to these granules which you have testified you gave to Mr. Nichols? A. Obviously.

"Q. 76. From this Exhibit A please fix the date of the meeting with Mr.

Nichols to which you have testified. A. Early part of February, 1930.

"Q. 77. It was at least prior to February 7, 1930, the date of this letter? A. Yes; it might have been in January." (*Italics ours.*)

Appellee's Exhibit A, referred to in the quoted testimony, consists of correspondence between appellant and the witness Folsom. The first of the two letters contained in the exhibit, dated February 7, 1930, was addressed to "Fiske & Co. Inc.," attention Mr. H. T. Folsom, and was signed by appellant. The first paragraph of the letter reads: "Pardon my delay in giving you the information which I promised to send you while in your office recently," and is followed by the statement that "approximately 30,000 tons of material similar to sample No. 101"—referred to in the above-quoted testimony of the witness Folsom—would "be consumed in 1930." The letter is concluded with the request that appellant be advised if the witness was "interested in developing the No. 101."

In reply to appellant's letter, the witness Folsom, under date of February 11, 1930—the second letter contained in Exhibit A, wrote that his company was continuing with the development of the red granules, No. 101, and also with the green. He further stated that his company had already made a semicommercial run of the green granules, and that they gave every indication of being satisfactory; that a semicommercial run of the red granules, No. 101, would be made that week; and that, if it proved "equally satisfactory," his company would be in a position to make the "necessary installation for the manufacture of this material."

It may be said at this point that appellant identified appellee's Exhibit A, and admitted that he had a conversation with the witness Folsom in January, 1930, at which time he was shown some burned granules and was told that they were made from raw shale and raw clay, and was given samples of them—some red and some green. Furthermore, although he had the opportunity to do so, appellant did not deny that the witness Folsom disclosed to him the process by which those granules were made; that is, the "process described in the Atkinson patent," as stated by Folsom in the italicized portion of his testimony hereinbefore quoted. Appellant admitted that, although the witness Folsom inquired as to the tonnage requirements of the Funkhouser Company and also as to whether appellant considered the granules acceptable to the roofing trade, he did not disclose to him that he had ever made any experiments for the purpose of making roofing granules from raw shale or clay.

The witness Folsom further stated that he knew Mr. R. J. Funkhouser, "president of the Funkhouser Company"; that he disclosed to Mr. Funkhouser the activities of the Fiske Company relative to making burned granules from raw shale; that several times he showed samples of such burned granules to Mr. Funkhouser in the latter's office in New York in the early part of 1930; and that Mr. Funkhouser told him "that his company had tried to make granules from raw shale; had spent considerable amount of money, $12,000 to $15,000, and reached the conclusion that it could not be done." We quote further from the testimony of the witness:

"Q. 85. And he [Mr. Funkhouser] made that statement when? A. At one of the early interviews I have referred to.

"Q. 86. From correspondence can you fix an approximate date of such statement? A. The first quarter of 1930.

"Q. 87. State whether or not at that time Mr. Funkhouser made any mention to you of any prior claim by his company of rights in this burned shale granule process. A. He did not.

"Q. 88. When, if ever, did he first make any such claim to you of prior rights? A. June, 1932.

"Q. 89. How do you fix that date? A. Correspondence on that subject."

The witness explained that his visit to Mr. Funkhouser's office at the time the latter made the hereinbefore quoted statements was due to the fact that the Funkhouser Company was then negotiating through Mr. R. J. Funkhouser with the Fiske Company for the purchase of brick to be used by the Funkhouser Company in making crushed brick granules.

Appellee's Exhibit B, consisting of letters written by Mr. R. J. Funkhouser, president of R. J. Funkhouser & Co., to

the witness Folsom, was identified by Folsom. The letters, seven in number, the first six of which relate to the purchase of brick, are dated January 15, January 23, January 30, February 7, March 11, June 21, and June 26, 1930, respectively.

The witness Folsom identified Appellee's Exhibit H, which consists, in part, of letters dated January 24, January 29, February 10, March 10, and June 25, 1930, respectively, written by him in reply to the first six letters hereinbefore referred to contained in Exhibit B. In the letters dated January 29 and March 10, the witness specifically referred to burned granules made from raw shale by his company.

The witness Folsom, whose statements in this regard are corroborated by a letter written by Mr. R. J. Funkhouser, dated June 26, 1930, which was introduced in evidence as a part of Appellee's Exhibit B, further stated that, as representative of his company, he had negotiations with Mr. R. J. Funkhouser relative to the Funkhouser Company purchasing burned shale granules made from the raw material from the Fiske Company for resale to various manufacturers of composition roofing; that these negotiations were carried on prior to June 26, 1930; and that, on June 26, 1930, Mr. R. J. Funkhouser wrote "Fiske & Company, Inc.," attention Mr. Folsom, and stated specifically the terms under which the Funkhouser Company would be willing to enter into a contract with the Fiske Company for the purchase of granules made from raw shale for resale. The witness further stated that his company rejected the offer made by Mr. Funkhouser.

Appellant Nichols testified that in January, 1930, his company was considering erecting a "brick crushing plant at the Fiske Watsontown yard," and a "combined brick making and brick granule crushing plant in the south." Appellant admitted that he was aware of the fact that his company was negotiating with the Fiske Company in 1930 for a sales agency for selling burned shale granules produced by the Fiske Company; that he was also aware of the fact that the Fiske Company started installation of a plant at Watsontown, Pa., in 1930, for burning raw shale granules, and that the plant was complet-

ed and the Fiske Company went into commercial production late in that year. He also admitted that, in August, 1930, he attempted to ascertain "details" of the equipment which the Fiske Company intended to install in its plant.

It appears from appellee's patent, and from the testimony submitted on behalf of appellee, that, although the temperatures to which shale granules are subjected depend upon the character of the raw material, they are ordinarily subjected to temperatures ranging from 1750°F. to 2000°F. for a period of approximately three to five hours. Appellee's patent further states that the purpose of subjecting the granules to those temperatures for the period of time mentioned is to secure a maximum hardness throughout their cross-section.

The witness Ralph W. B. Reade, who was manufacturing manager of the Flintkote Company from 1920 until December, 1932, stated that "They [the granules] are tested for size and gradation of size, for hardness, freedom from dust, blistering, tendency to discolor, blooming, ability to bond to the asphalt, [and] character of surface produced on a sheet of roofing." When asked if fastness of color was another item, he replied: "Yes, that is an important one." The witness stated that the presence of excessive dust indicated that the granules were too soft; that with excessive dust present it would be difficult to secure "a good bond between the granule and the asphalt in which it is embedded"; that "Blooming is an effervesence of a soluble salt that forms on the surface of the granule; it looks like snow or frost, white"; that, if the granules were not sufficiently hard, they would be porous and would "absorb oils from the asphalt and thereby become discolored," and they would also be "subject to moisture absorption which influences blistering"; that it was absolutely necessary, in order to determine whether granules were satisfactory for the purpose for which they were produced, to apply them to asphalt roofing, and subject such roofing to a series of tests, both in the laboratory and under exposure conditions; that it requires at least two hundred pounds of granules to make a proper test; that there are many laboratory tests to which granules are subjected, including tests in a "weatherometer or accelerating weathering.

machine"; that it requires a period of ninety days to make a proper test on those machines; that the Flintkote Company not only subjected granules to the weatherometer tests, but it maintained "large outdoor exposure decks at our New Orleans plant, where products from all parts of the country were tested. The climatic conditions in New Orleans are so much more severe as they affect asphalt roofings and shingles than they are in the North, that we were able to gauge from a limited period of exposure there the results that would be obtained under exposure conditions in other sections of the country."

In his decision, the Examiner of Interferences stated that appellant had failed to establish beyond a reasonable doubt that he had conceived the invention prior to appellee's filing date, January 13, 1930; that, even though it be conceded that appellant had conception of some of the counts prior to appellee's filing date, "he would still be unable to prevail for lack of diligence" from immediately prior to the time appellee entered the field, January 13, 1930, and thereafter, until appellant reduced the invention to practice by filing his application, July 26, 1932; that the evidence failed to show any activity by appellant from immediately prior to January 13, 1930 to June, 1930, and, in awarding priority of invention to appellee, held that, if it be conceded that appellant conceived the involved invention and reduced it to practice as early as 1925, as claimed by him, he had concealed it from the public, and was therefore estopped from claiming priority of invention under the doctrine of concealment, announced in the case of Mason v. Hepburn, 13 App.D.C. 86.

In its decision affirming the decision of the Examiner of Interferences, the Board of Appeals held that appellant had failed to establish beyond a reasonable doubt that he was in possession of the invention defined by the appealed counts prior to appellee's filing date, and stated that, even though it be conceded that appellant was in possession of the invention prior to January 13, 1930, his subsequent acts were such as to make the doctrine announced in the case of Mason v. Hepburn, supra, applicable, and he was estopped from claiming priority of invention in this interference.

We think it is clear from the evidence of record that appellant and his witnesses Voris and Larsen made experiments for the purpose of producing hardened granules made from raw shale prior to appellee's filing date; that, in doing so, raw shale granules were heated to temperatures ranging from 1200°F. up to the temperatures at which they would fuse together; that the witness Voris experimented in burning raw shale granules in 1926, 1927, 1928, and 1929; and that appellant and the witness Larsen burned raw shale granules in the laboratory of F. L. Smidth & Co., Elizabeth, N. J., on December 21, 1927. There is nothing of record, however, to establish that either of appellant's witnesses had any knowledge as to what constituted successful and satisfactory burned shale granules to be used in surfacing asphalt roofing. Nor does it appear of record that the witness Voris ever made any tests to determine whether the granules burned by him were suitable for roofing purposes, or that he had any information as to the tests necessary for determining their suitability for such purposes.

Although the witness Larsen testified that the experiments performed by him were successful, he said that the only test to which he subjected the granules burned by him was made for the purpose of ascertaining the *comparative hardness of the burned and the raw granules,* and, when asked how he tested them, he said "just with a blow of a hammer."

Appellant contends that tests were not necessary to determine the suitability of granules for roofing purposes, and states that the test made by the witness Larsen for the purpose of determining the *comparative hardness of the raw and the burned granules* by striking them with a hammer and his (appellant's) observation of "the color after controlling the amount of air which was used for the combustion of the gases in the burning of the granules" were sufficient, in view of his broad knowledge of the characteristics of satisfactory granules, to indicate to him that those burned by him and the witnesses Voris and Larsen were suitable for roofing purposes.

That appellant seemed to recognize that tests were necessary in order to determine whether burned shale granules were suitable for roofing purposes is clearly indi-

cated by his testimony wherein he said that he subjected the granules burned for him by the witness Larsen to "Boiling tests, acid tests, blistering tests and weatherometer tests," and that he also applied some of them to roofing in the laboratory of the Funkhouser Company. (It may be said, however, that his testimony with reference to those tests is wholly uncorroborated.)

It clearly appears from the testimony of appellee's witnesses Mercer and Reade, hereinbefore set forth, that it was impossible to determine whether burned granules made from raw shale or clay were suitable for surfacing asphalt roofing, unless they were applied to such roofing and then subjected to a series of laboratory tests and also exposed to the weather.

We think it is clear from the record that the tests referred to by the witnesses for appellee were not only required by the roofing trade, but were necessary in order to determine whether burned shale granules had any utility for roofing purposes, and, unless they were made, it would be impossible to determine whether the process by which the granules were produced was successful.

It is unnecessary for us to determine whether appellant conceived the invention here involved prior to appellee's filing date, because it clearly appears from the record, as held by the tribunals of the Patent Office, that no adequate tests were ever made by appellant's witnesses Voris and Larsen, or by any other person or persons who burned raw shale granules for appellant.

Although appellant testified that he had made tests as early as 1925, and that his reason for not filing his application at that time was because he did not believe his alleged invention patentable, his testimony is wholly uncorroborated in that regard, and the record fails to establish that he reduced the invention to practice prior to the filing of his application—July 26, 1932.

Assuming that appellant conceived the invention prior to appellee's filing date, January 13, 1930, the question then presented is whether he was diligent from immediately prior to January 13, 1930 and thereafter until he reduced his invention to practice by filing his application, July 26, 1932.

There is no evidence of record to establish that appellant made any effort to reduce the invention to practice from immediately prior to January 13, 1930 to July, 1930, or that any experiments were made by him or by any one for him during that period. Furthermore, it appears from appellant's testimony that, in January, 1930, his employer, the Funkhouser Company, was considering the purchase of brick from the Fiske Company to be used in making crushed brick granules; that, during that month, appellant had a conversation with the witness Folsom, at which time Folsom showed appellant some burned granules made from raw shale and raw clay; that appellant was given some samples of those granules, which he took with him; that Folsom made inquiry as to appellant's tonnage requirements; and that appellant wrote to Mr. Folsom, under date of February 7, 1930, stating the tonnage requirements of the Funkhouser Company. It will be observed that, during that conversation, the witness Folsom disclosed not only the burned granules made from raw shale and raw clay to appellant, but also the process by which they were made, as disclosed in appellee's patent.

Appellant made no denial of such disclosures, nor did he suggest to Folsom that he had ever made any effort to produce burned granules from raw shale or clay.

Appellant testified that in 1930 his company was negotiating with the Fiske Company, appellee's assignee, for a sales agency for selling burned shale granules made by the Fiske Company; that he knew, during that year, that the Fiske Company was purchasing equipment to make burned shale granules; that in August, 1930, he wrote to the Harrop Engineering Company of Cincinnati, which company was designing a coloring plant for the Fiske Company, and inquired as to the equipment it was proposing to install; and that, about that time, he wrote to the Nichols Copper Company to ascertain the kind of equipment supplied by them to the Fiske Company for use in the latter's granule plant. He further stated that, in January, 1930, when he was negotiating with the Fiske Company for the purchase of brick for making brick granules, his company was considering the erection of a brick crushing

plant at the "Fiske Watsontown yard," and a "combined brick making and brick granule crushing plant in the south."

It is not denied that Mr. R. J. Funkhouser stated to appellee's witness Mercer that the Fiske Company could not produce satisfactory burned shale granules, because it did not have sufficient financial resources to carry out the process and deliver them, and that the Funkhouser Company had experimented extensively and had been unable to produce satisfactory burned shale roofing granules. It appears that those statements were made some time between August, 1930, and the latter part of that year. Mr. Funkhouser further stated to the witness Folsom, in the early part of 1930, that the Funkhouser Company had expended from $12,000 to $15,000 in an effort to make satisfactory granules from raw shale, and had reached the conclusion that it could not be done.

The witness Folsom testified that, in January, 1930, appellant, Nichols, told him that it would be a wonderful thing if the Fiske Company could make satisfactory burned shale granules under the process described to appellant by Folsom, which, the latter said, was the process described in the Atkinson patent.

Mr. R. J. Funkhouser did not testify, and as no reason is given in the record for his not doing so, and as appellant did not deny that Folsom disclosed the involved invention to him in January 1930, we must accept the testimony of the witness Mercer, with regard to Mr. Funkhouser's statements to him, and that of Folsom, relative to his conversations with R. J. Funkhouser and his disclosures to appellant.

It further appears that Mr. R. J. Funkhouser wrote the Fiske Company, attention Mr. Folsom, as late as June 26, 1930, Appellee's Exhibit B, and stated in his letter the conditions under which the Funkhouser Company would purchase burned shale granules from the Fiske Company for resale to manufacturers of composition roofing during the first twelve months of production.

It may be noted that Mr. E. N. Funkhouser of the Funkhouser Company testified that he did not participate in any of the tests made on behalf of appellant; that it was anticipated that the Funkhouser Company would fire the raw shale granules to develop a certain shade of red; that those granules were purchased from the Watsontown Brick Company under a contract—Appellant's Exhibit No. 21—dated May, 1928.

The witness Neikirk, plant manager of the granule plant of the Funkhouser Company at Watsontown, stated that, at about the time the Fiske Company was starting the erection of its plant for producing burned shale granules, he was instructed to "try to hire a spy to get into the Fiske burned granules plant at Watsontown," and that the purpose of such instruction was to ascertain the Fiske Company's equipment and process. This testimony was uncontradicted.

We think it is evident from the conduct of appellant, the Funkhouser Company, and R. J. Funkhouser, and from the statements made by appellant and R. J. Funkhouser in 1930, hereinbefore referred to, that appellant had not reduced the invention to practice prior to appellee's filing date, January 13, 1930; that he was not diligent in reducing it to practice from immediately prior to January 13, 1930, to July, 1930, and is therefore, as held by the concurring decisions of the Patent Office tribunals, not entitled to an award of priority.

For the reasons stated, the decision of the Board of Appeals is affirmed.

Affirmed.